# United States Court of Appeals for the Federal Circuit

---

**ABS GLOBAL, INC.,**
*Appellant*

**v.**

**CYTONOME/ST, LLC,**
*Appellee*

---

2019-2051

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2017-02097.

---

Decided: January 6, 2021

---

STEVEN J. HOROWITZ, Sidley Austin LLP, Chicago, IL, argued for appellant. Also represented by PAUL J. ROGERSON.

PRATIK A. SHAH, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, argued for appellee. Also represented by RACHEL BAYEFSKY, Z.W. JULIUS CHEN; DANIEL LYNN MOFFETT, KIRT S. O'NEILL, San Antonio, TX.

---

Before PROST, *Chief Judge*, MOORE and STOLL, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* STOLL.

Opinion dissenting in part filed by *Chief Judge* PROST.

STOLL, *Circuit Judge*.

ABS Global, Inc. appeals the Patent Trial and Appeal Board's decision in an inter partes review sustaining the patentability of certain claims of U.S. Patent No. 8,529,161, which is assigned to Cytonome/ST, LLC. Because ABS's appeal is moot, we dismiss the appeal.

## BACKGROUND

Cytonome is the assignee of the '161 patent, directed to microfluidic devices and methods of configuring microfluidic systems. A key issue in this case is whether Cytonome, the appellee in this IPR appeal, can reasonably be expected to assert the '161 patent against ABS in the future. To facilitate a full understanding of this issue, we provide background on both the IPR proceedings below and parallel district court proceedings.

In June 2017, Inguran, LLC, XY, LLC, and Cytonome filed a complaint against ABS and other defendants in district court asserting infringement of claims of six patents, including the '161 patent. Four months later, ABS filed a petition for inter partes review of all claims of the '161 patent. The Board instituted review and subsequently, in April 2019, issued a final written decision that invalidated certain claims of the '161 patent. The Board concluded that ABS had failed to demonstrate that the remaining claims of the '161 patent were unpatentable. Two weeks after the Board's final written decision, the district court granted in part ABS's motion for summary judgment, concluding that ABS's accused products did not infringe any of the '161 patent claims. In June 2019, nearly two months after the district court's summary judgment decision, ABS appealed the Board's final written decision. The district court held a jury trial covering the patents remaining in the case in September 2019.

ABS filed its opening brief challenging the Board's final written decision in this court in November 2019. Cytonome's response brief, filed about three months later, included an affidavit by Cytonome's counsel stating that Cytonome "has elected not to pursue an appeal of the district court's finding of non-infringement as to the '161 patent and hereby disclaims such an appeal." Appellee's Br. Add. 1. Cytonome then argued that, because it disavowed its ability to challenge the district court's summary judgment that ABS did not infringe the '161 patent claims, ABS lacked the requisite injury in fact required for Article III standing to appeal the Board's final written decision regarding validity of the claims of the '161 patent.

Four months later, in June 2020, the district court entered final judgment of noninfringement as to the '161 patent claims. ABS then timely filed motions for judgment as a matter of law with respect to the validity and infringement of the patent claims tried to the jury. The district court has not yet ruled on ABS's post-trial motions.

## DISCUSSION

At the outset, we must address the jurisdictional issue first raised in Cytonome's response brief on appeal. Cytonome argues that because it disclaimed any appeal of the district court's judgment of noninfringement as to the '161 patent, ABS lacks Article III standing to pursue its appeal of the Board's final written decision regarding the '161 patent claims' validity. Specifically, Cytonome maintains that ABS cannot demonstrate injury in fact sufficient to support standing because there is no basis to conclude that ABS is engaged in activity that would place it at substantial risk of infringement of the '161 patent claims. Appellee's Br. 20–21. ABS responds that mootness, not standing, provides the proper framework to assess jurisdiction in this case. In arguing that its appeal is not moot, ABS relies solely on a purported patent-specific exception to the mootness doctrine set forth in *Fort James Corp.*

*v. Solo Cup Co.*, 412 F.3d 1340 (Fed. Cir. 2005). Because we conclude that the voluntary cessation doctrine governs the mootness inquiry in this case, that Cytonome has demonstrated that its challenged conduct is not reasonably expected to recur, and that ABS has failed to demonstrate that it is engaged in or has sufficiently concrete plans to engage in activities not covered by Cytonome's disavowal, we dismiss ABS's appeal as moot.

I

This case presents an issue of mootness based on voluntary cessation. Our resolution of this issue is guided by the Supreme Court's framework in *Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013). In *Already*, Nike brought a trademark infringement suit against Already and Already counterclaimed that Nike's trademark was invalid. *Id.* at 88. Eight months after Nike filed its complaint and four months after Already filed its counterclaim, Nike concluded that the case no longer "warrant[ed] the substantial time and expense of continued litigation" and unilaterally issued a covenant not to sue Already. *Id.* at 88–89 (citation omitted). Nike's covenant disclaimed any future trademark or unfair competition claim against Already or any affiliated entity "based on any of Already's existing footwear designs, or any future Already designs that constituted a 'colorable imitation' of Already's current products." *Id.* at 89 (citation omitted). Nike moved to dismiss its claims and Already's counterclaims, arguing that the covenant not to sue had mooted any case or controversy. *Id.* Already opposed Nike's motion, citing an affidavit from its president stating that Already had plans to market new versions of its shoes to support its argument that Nike did not establish that voluntary cessation mooted the case. *Id.* The district court granted Nike's motion after "[f]inding no evidence that Already sought to develop any shoes not covered by the covenant," and the Second Circuit affirmed. *Id.* at 89–90.

On appeal, the Supreme Court explained that as a threshold matter, a case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* at 91 (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)).  But "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." *Id.* (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).  Instead, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).

Applying the voluntary cessation doctrine to the facts, the Court explained that initially, "it was Nike's burden to show that it 'could not reasonably be expected' to resume its enforcement efforts against Already." *Id.* at 92 (quoting *Friends of the Earth*, 528 U.S. at 190).  Nike's broad covenant satisfied this burden, the Court concluded, because it "allow[ed] Already to produce all of its existing footwear designs . . . and any 'colorable imitation' of those designs." *Id.* at 93.  Indeed, the Court found it "hard to imagine a scenario that would potentially infringe [Nike's trademark] and yet not fall under the Covenant." *Id.* at 94 (alteration in original) (citation omitted).

Once Nike "demonstrat[ed] that the covenant encompasse[d] all of its allegedly unlawful conduct, it was incumbent on Already to indicate that it engages in or has sufficiently concrete plans to engage in activities not covered by the covenant." *Id.*  In shifting the burden to Already, the Court noted that "information about Already's business activities and plans is uniquely within its possession." *Id.*  The Court determined that Already failed to carry its burden because "Already did not assert any intent to design or market a shoe that would expose it to any prospect of infringement liability." *Id.* at 95.  The Court also

concluded that the affidavit from Already's president was insufficient because it "sa[id] little more than that Already currently has plans to introduce new shoe lines and make modifications to existing shoe lines," without "stat[ing] that these shoes would arguably infringe Nike's trademark yet fall outside the scope of the covenant." *Id.* Considering the covenant's broad language and Already's failure to assert "concrete plans to engage in conduct not covered by the covenant," the Court "conclude[d] the case is moot because the challenged conduct cannot reasonably be expected to recur." *Id.*

## II

Turning to the application of the voluntary cessation doctrine in this case, we conclude that Cytonome's disavowal of its right to appeal the district court's noninfringement judgment mooted ABS's appeal. Because Cytonome, like Nike in *Already*, voluntarily ceased its efforts to enforce its intellectual property right against the products at issue in the district court litigation, the voluntary cessation doctrine governs the mootness inquiry. Applying the voluntary cessation framework, we first conclude on this record that Cytonome has demonstrated that it cannot reasonably be expected to resume its enforcement efforts against ABS. Shifting the burden of production to ABS, we then determine that ABS has not offered any evidence of current activity or plans to engage in activity that would subject ABS to infringement liability under the '161 patent. Finally, we find unpersuasive ABS's contention that an exception to mootness articulated in *Fort James* renders ABS's appeal not moot. Because the record demonstrates that there is no longer a live case or controversy between the parties, ABS's IPR appeal is moot.

## A

We first address whether Cytonome has demonstrated that the challenged behavior—Cytonome's assertion of the '161 patent against ABS—cannot reasonably be expected

to recur. *See Already*, 568 U.S. at 92. Though Cytonome's affidavit disavowing its appeal is unquestionably narrower than the covenant not to sue in *Already*, we agree with Cytonome that, like Nike's covenant not to sue in *Already*, Cytonome's disavowal here is "coextensive with the asserted injury" in fact. Oral Arg. at 30:22–32:10, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=19-2051_09032020.mp3; *see also* Appellee's Br. 21 (arguing that ABS cannot demonstrate an injury in fact because "ABS has already secured a district court's summary judgment that it is *not* infringing the '161 patent" and Cytonome's disclaimer of any appeal leaves "no basis to conclude that ABS is currently engaging in infringing activity" (citations and internal quotation marks omitted)).[1]

According to Cytonome, ABS's only alleged injury in fact was the threat of an infringement finding in the pending parallel district court infringement proceeding. Oral Arg. at 31:20–31:33. With respect to potential infringement liability based on future products, Cytonome maintains that "nothing in the record suggests ABS is substantially at risk of infringement." Appellee's Br. 22. ABS does not meaningfully dispute these assertions.[2] And,

---

[1]    Though Cytonome's brief frames the issue in terms of standing, its arguments regarding ABS's ongoing interest in the IPR appeal also apply to mootness. *See Friends of the Earth*, 528 U.S. at 189 ("[M]ootness can be described as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" (quoting *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 68 n.22 (1997))); *cf. id.* at 190 (recognizing differences in burdens of proof applicable to mootness and standing).

[2]    For example, ABS does not identify plans to market future products that would possibly be the subject of a

absent reversal or vacatur on appeal, the district court's summary judgment of noninfringement therefore removes ABS's alleged injury in fact. Accordingly, Cytonome's disavowal of its right to appeal the summary judgment of noninfringement is coextensive with the asserted injury in fact.

Cytonome has also demonstrated that its disavowal made it unlikely that its challenged behavior would recur. For purposes of our analysis here, Cytonome's disavowal of its right to appeal effectively made final the district court's judgment of noninfringement. And once ABS in effect had "a final judgment of noninfringement in the [district court]—where all of the claims were or could have been asserted against [ABS]—the accused devices acquired a status as noninfringing devices, and [Cytonome] is barred from asserting that they infringe the same patent claims a second time." *Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045, 1058 (Fed. Cir. 2014); *see also SpeedTrack, Inc. v. Office Depot, Inc.*, 791 F.3d 1317, 1323 (Fed. Cir. 2015) ("[U]nder *Kessler* [*v. Eldred*, 206 U.S. 285 (1907)], a party who obtains a final adjudication in its favor obtains 'the right to have that which it lawfully produces freely bought and sold without restraint or interference.'" (quoting *Rubber Tire Wheel Co. v. Goodyear Tire & Rubber Co.*, 232 U.S. 413, 418 (1914))); *MGA, Inc. v. Gen. Motors Corp.*, 827 F.2d 729, 734 (Fed. Cir. 1987) ("The *Kessler* doctrine bars a patent infringement action against a customer of a seller who has previously prevailed against the patentee because of

---

future claim of infringement of the '161 patent claims. The only potential injury in fact identified by ABS arises from Cytonome's "broader strategy of serial patent litigation against ABS" and potential estoppel effects of the Board's decision in future litigation involving the '161 patent under 35 U.S.C. § 315(e). Reply Br. 9–10; *see id.* at 2–11.

invalidity or noninfringement of the patent; otherwise, the effect of the prior judgment would be virtually destroyed.").

Cytonome's disavowal therefore estops Cytonome from asserting liability against ABS for infringement of the '161 patent claims in connection with the accused products, thereby allowing ABS to make, use, and sell those products freely. *See SpeedTrack*, 791 F.3d at 1326 ("*Kessler* provides a party who has prevailed in a patent litigation the right to manufacture, use, or sell the product that has been deemed not to infringe without fear of continued challenges to that right based on the same patent."). Cytonome's disavowal would also bar a future suit for infringement of the '161 patent claims covering ABS products that are "essentially the same" as ABS's currently accused products. *Brain Life*, 746 F.3d at 1058; *see id.* at 1059 ("The *Kessler* Doctrine precludes Brain Life from asserting any claims of the '684 patent against Elekta's . . . [accused] products, however, because they are essentially the same as the iterations litigated in the first suit.").

B

Because Cytonome has demonstrated on this record that its disavowal "encompasses all of its allegedly unlawful conduct, it was incumbent on [ABS] to indicate that it engages in or has sufficiently concrete plans to engage in activities not covered by the [disavowal]." *Already*, 568 U.S. at 94. As in *Already*, "information about [ABS's] business activities and plans is uniquely within its possession." *Id.* On this record, we conclude that ABS has failed to produce any such evidence of an injury sufficient to support an ongoing case or controversy, i.e., evidence that ABS reasonably expects Cytonome to sue ABS for infringement of the '161 patent claims.

ABS acknowledged during oral argument that there was no evidence in the record that ABS engaged in or had concrete plans to engage in activities not covered by Cytonome's disavowal. Oral Arg. at 9:34–10:01. With respect

to additional evidence outside the record, ABS stated only that it had "shifted to a new design" that was the subject of another infringement suit in which Cytonome asserted different patents. *Id.* at 6:12–7:40. Cytonome's counsel represented that ABS had argued at trial in the district court that its new design was a "redesign that avoids the '161 [patent]." *Id.* at 23:14–24:38. And ABS has not asserted before this court that its new design would arguably infringe the '161 patent claims so as to "expose [ABS] to any prospect of infringement liability." *Already*, 568 U.S. at 95.

ABS's only other argument that it engages in or plans to engage in activity that would expose it to any prospect of infringement liability is not specific to the '161 patent and relies solely on the parties' prior litigation history. *See, e.g.*, Oral Arg. at 11:42–12:40 ("On the question of whether we think it's reasonable . . . to expect them to sue again, . . . they have repeatedly sued us on the same patents, that is to say, multiple cases involving the same one patent, . . . not the '161 patent, but the point is that they have a course of conduct that reveals their suing us repeatedly on the same patent covering the same period of time."); Reply Br. 9 ("Cytonome's attempt to moot this appeal is also in line with its broader strategy of serial patent litigation against ABS."). Indeed, ABS acknowledges that it currently faces no "specific threat" of an infringement suit asserting the '161 patent claims. Oral Arg. at 9:34–10:45. ABS nonetheless asserts that in view of the prior litigation between the parties, "it is *at least conceivable* that Cytonome would sue [ABS] on the '161 patent with respect to the aspects of the case that sort of post-date the judgment." *Id.* (emphasis added). Even then, however, ABS believes that it "would have a very strong preclusion argument" if Cytonome were to again sue ABS for infringement of the '161 patent claims based on ABS's ongoing use of the kinds of devices accused in the district court proceedings. *Id.* at 11:12–11:38.

As an initial matter, ABS's assertion that Cytonome's behavior will *conceivably* recur does not establish that ABS's IPR appeal is not moot under the voluntary cessation framework. *See Already*, 568 U.S. at 92 ("That is the question the voluntary cessation doctrine poses: Could the allegedly wrongful behavior *reasonably* be expected to recur?" (emphasis added)). In any event, we find Article III standing cases instructive in assessing ABS's evidence of ongoing injury.

When a "party relies on potential infringement liability as a basis for injury in fact, but is not currently engaging in infringing activity," our Article III standing cases explain that the party "must establish that it has concrete plans for future activity that creates a substantial risk of future infringement or [will] likely cause the patentee to assert a claim of infringement." *JTEKT Corp. v. GKN Auto. Ltd.*, 898 F.3d 1217, 1221 (Fed. Cir. 2018). In *JTEKT*, JTEKT sought to appeal an adverse IPR decision holding valid certain claims of GKN's patent. *Id.* at 1218–19. At the time of the appeal, GKN and JTEKT were "competitors generally," but GKN had not accused JTEKT of infringement. *Id.* at 1221. Moreover, "JTEKT expressly conceded that 'no [potentially infringing] product is yet finalized,'" and noted that the product "concept will continue to evolve and may change until it is completely finalized." *Id.* (citations omitted). This court held that JTEKT lacked standing because it "ha[d] not established at this stage of the development that its product creates a concrete and substantial risk of infringement or will likely lead to claims of infringement." *Id.*

Similarly, in *General Electric Co. v. United Technologies Corp.*, 928 F.3d 1349, 1355 (Fed. Cir. 2019), this court held that General Electric (GE) lacked Article III standing to maintain its IPR appeal for failure to establish injury in fact. United Technologies (UTC) had not sued GE for infringement at the time of GE's IPR appeal and GE submitted two declarations to support injury in fact. *Id.* at 1352.

The declarations attested that GE develops new engines based on old designs and that UTC's '605 patent, at issue in the IPR, hampered GE's ability to use an old geared-fan engine design to develop new engine designs. *Id.* GE declared that UTC's patent thus impeded GE's "ability to compete in a highly regulated industry" and that designing around UTC's '605 patent imposed increased research and development costs on GE. *Id.* GE also declared that in developing a bid for submission to a customer, GE spent time and money "research[ing and developing] a geared-fan engine design that 'would potentially implicate [UTC's] 605 Patent.'" *Id.* at 1353 (second alteration in original) (citation omitted). Ultimately, GE chose not to submit that design, but the record did not specify why GE made this choice or indicate whether GE won the bid. *Id.* More generally, GE attested that "it needs to be able to meet customer needs with a geared-fan engine design that may implicate the '605 patent." *Id.*

This court deemed GE's competitive injuries "too speculative to support constitutional standing," because the record did not "show[] a concrete and imminent injury to GE related to the '605 patent." *Id.* (citing *Phigenix, Inc. v. Immunogen, Inc.*, 845 F.3d 1168, 1171 (Fed. Cir. 2017)). Specifically, GE did not assert that it lost bids as a result of its inability to deliver a geared-fan engine design, that potential infringement liability drove GE's decision about which design to submit to its customer, or that GE lost business opportunities because it could not deliver a potentially infringing geared-fan engine design. *Id.* at 1353–54. Nor could GE's assertion of economic losses support standing, because GE "fail[ed] to provide an accounting for the additional research and development costs expended to design around the '605 patent," or any "evidence that GE actually designed a geared-fan engine," or that GE's increased research and development costs were tied to customer demand for a geared-fan engine. *Id.* at 1354. In other words, GE failed to causally link increased research

and development costs to the '605 patent. *Id.* This court also concluded that GE did not establish future injury due to the absence of "evidence that GE is in the process of designing an engine covered by claims . . . of the '605 patent" or "has definite plans to use the claimed features of the '605 patent in the airplane engine market." *Id.* (citing *JTEKT*, 898 F.3d at 1221). Because GE failed to establish injury in fact sufficient to support a case or controversy, this court held that GE lacked standing to pursue its IPR appeal. *Id.* at 1355.

Considering these cases, we conclude that ABS's IPR appeal is moot because there is no injury sufficient to support an ongoing case or controversy. Though ABS is correct that "a statutory grant of a procedural right" to an IPR appeal "may relax the requirements of immediacy and redressability[,] . . . the statutory grant of a procedural right does not eliminate the requirement that [ABS] have a particularized, concrete stake in the outcome of the [IPR appeal]." *Consumer Watchdog v. Wis. Alumni Research Found.*, 753 F.3d 1258, 1262 (Fed. Cir. 2014) (first citing *Massachusetts v. E.P.A.*, 549 U.S. 497, 517–18 (2007); and then citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). Here, the evidence in the record fails to establish that ABS had a "particularized, concrete stake in the outcome" of its IPR appeal. *Id.*

ABS's evidence of injury falls far short even of the evidence we have held insufficient to establish injury in fact to support standing. For example, unlike JTEKT and GE, ABS has not alleged that it is developing or has plans to develop any potentially infringing product, or that the '161 patent claims impeded its ability to develop any products or meet customer needs. Nor has ABS asserted that it incurred additional costs as a result of trying to design around the '161 patent claims or that it allocated resources to developing a product arguably covered by the '161 patent claims. Indeed, ABS represents that there is no record evidence of any activity by ABS to take action that would

implicate the claims of the '161 patent. Oral Arg. at 9:34–10:01. With respect to litigation, ABS stands in the same position as GE and JTEKT (which had not been sued for infringement) given the absence of any "specific threat" of an infringement suit asserting the '161 patent. *See id.* at 9:34–10:45.

ABS's evidence of injury essentially amounts to the existence of a nonzero risk of future litigation based on its litigation history with Cytonome. *See id.* at 11:42–12:40. Without more, this is clearly insufficient to establish injury in fact to defeat mootness, even considering that Cytonome repeatedly asserted other patents against ABS. Prior litigation history alone does not establish a basis for ABS to reasonably expect that Cytonome will again assert the '161 patent claims against ABS. *See AVX Corp. v. Presidio Components, Inc.*, 923 F.3d 1357, 1365 (Fed. Cir. 2019) (concluding, in a case where parties had a history of prior litigation, that "AVX's suspicion that Presidio would assert the upheld claims against AVX if it had a reasonable basis for doing so . . . does not mean that there is any reasonable basis right now" (citation omitted)). As in *AVX*, there is no evidence that ABS's prior litigation history with Cytonome on different patents has made its risk of litigation for infringement of the '161 patent claims any more concrete. *See id.* ("It does not matter that Presidio has sued AVX over capacitors that did not contain the buried metallizations claimed in the [subject] patent.").

Because ABS has not established that it "engages in or has sufficiently concrete plans to engage in activities not covered by" Cytonome's disavowal, we conclude that ABS has not rebutted Cytonome's showing that Cytonome's conduct is not reasonably expected to recur. *Already*, 568 U.S. at 94.

C

We also find unpersuasive ABS's primary argument that its IPR appeal is not moot based on an exception to

mootness that ABS gleans from *Fort James*. According to ABS, *Fort James* describes an exception to mootness "that arises in the context of patent law: a patent owner who strategically waits until *after* the resolution of its claim for patent infringement to offer a covenant not to sue (and not to appeal) does not moot a challenge to the patent's validity." Reply Br. 6. We do not read *Fort James* so broadly. Nonetheless, ABS does not even attempt to explain how *Fort James*, which was decided in the context of a single proceeding, applies to this case, which involves parallel IPR and district court proceedings.

*Fort James* involved a patent infringement lawsuit by Fort James Corporation against Solo Cup Company in which Solo Cup denied the infringement allegations and asserted counterclaims for invalidity, unenforceability, and noninfringement. 412 F.3d at 1342–43. The district court bifurcated Solo Cup's unenforceability counterclaim from the infringement and invalidity issues, which were tried to a jury. *Id.* at 1344. The jury upheld the validity of the asserted patent claims and found them not infringed. *Id.* at 1345. Solo Cup subsequently requested that the district court schedule a hearing on the unenforceability counterclaim, which Fort James opposed, arguing that the jury verdict eliminated the controversy underlying the counterclaim. *Id.* In response to the district court's request for additional briefing, Fort James attached as an exhibit to its brief a covenant not to sue Solo Cup on the three originally asserted patents, which also represented that Fort James would not seek to overturn the jury's verdict. *Id.* The district court dismissed as moot Solo Cup's unenforceability counterclaim. *Id.*

On appeal, this court determined that Fort James's post-verdict covenant "had no effect on Fort James's claim for infringement" in the same proceeding, "because that controversy had already been resolved by the jury's verdict." *Id.* at 1348. Accordingly, to assess mootness, this court addressed "whether the [district] court retained

jurisdiction to hear Solo Cup's declaratory judgment counterclaim after the jury determined that Solo Cup's products do not infringe Fort James's patents." *Id.* This court relied on *Cardinal Chemical Co. v. Morton International, Inc.* for the proposition that "a counterclaim questioning the validity or enforceability of a patent raises issues beyond the initial claim for infringement that are not disposed of by a decision of non-infringement." *Id.* (first citing *Cardinal Chem.*, 508 U.S. 83, 96 (1993); and then citing *Altvater v. Freeman*, 319 U.S. 359, 364 (1943)). Accordingly, this court concluded that "the jury verdict holding that Solo Cup did not infringe Fort James's patents did not moot Solo Cup's counterclaim for unenforceability nor did it act to divest the district court of jurisdiction to hear that unlitigated counterclaim." *Id.* (first citing *Fin Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1321 (Fed. Cir. 2001); and then citing *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1356 (Fed. Cir. 1999)).

Rather than creating the broad exception advocated by ABS, we view *Fort James* as a straightforward application of *Cardinal Chemical*. *Cardinal Chemical* "affirmed the unremarkable proposition that a court's 'decision to rely on one of two possible alternative grounds (noninfringement rather than invalidity) did not strip it of *power* to decide the second question, particularly when its decree was subject to review by this Court.'" *Already*, 568 U.S. at 95 (quoting *Cardinal Chem.*, 508 U.S. at 98). Whereas judgment in favor of Solo Cup on its unenforceability counterclaim in *Fort James* could provide an alternative ground for the district court's judgment against Fort James, the same cannot be said here. A determination of invalidity in ABS's IPR proceeding here could not provide an alternative ground for the district court's judgment against Cytonome in an entirely different proceeding. ABS assumes without explanation that *Fort James*—which assessed whether resolution of infringement claims mooted unenforceability counterclaims within the same proceeding—would apply to

assessing the mootness of claims in a second proceeding caused by resolution of other claims in a first, separate, proceeding. Accordingly, we are unpersuaded by ABS's argument that *Fort James* compels the conclusion that its IPR appeal is not moot.

We therefore reject ABS's argument that Cytonome's "opportunistic approach" triggers an exception to mootness in this case and conclude that Cytonome has demonstrated that there is no ongoing case or controversy with respect to ABS's IPR appeal. Reply Br. 9. Accordingly, ABS's IPR appeal is moot.

### III

Finally, we turn to an assertion ABS raised for the first time during oral argument: if we find this case moot, the proper disposition would include "vacat[ing] the challenged portions of the [Board's] decision." Oral Arg. at 7:48–8:03. We decline to do so.

ABS did not timely request vacatur, despite ample opportunity to do so. This case became moot on February 21, 2020, when Cytonome filed the affidavit disclaiming any appeal of the Board's decision. In its reply, filed nearly two months later, ABS asserted that its appeal was not moot but failed to argue in the alternative that vacatur of the decision below would be the appropriate remedy should we decide that its appeal was moot. Instead, ABS waited over seven months to raise vacatur, requesting it for the first time at oral argument. Even then, ABS did not develop its assertion or explain why vacatur would be the appropriate remedy either at oral argument or by seeking permission to file supplemental briefing. We conclude that ABS failed to preserve its argument and, accordingly, we exercise our discretion to find forfeiture and therefore deny its request. *See Henry v. Dep't of Justice*, 157 F.3d 863, 865 (Fed. Cir. 1998) ("The government's argument . . . was raised for the first time at oral argument and comes too late." (citing *Sanders v. U.S. Postal Serv.*, 801 F.2d 1328, 1331–32

(Fed. Cir. 1986))); *Orion Sales, Inc. v. Emerson Radio Corp.*, 148 F.3d 840, 843 (7th Cir. 1998) (holding that appellant waived its request for vacatur by raising it for the first time at oral argument); *Radiant Global Logistics, Inc. v. Furstenau*, 951 F.3d 393, 397 (6th Cir. 2020) (per curiam) ("[V]acatur is an equitable remedy subject to the strictures of waiver and forfeiture." (citing *United States v. Munsingwear, Inc.*, 340 U.S. 36, 39–41 (1950))).

## CONCLUSION

We have considered the parties' remaining arguments and do not find them persuasive.  For the foregoing reasons, we dismiss ABS's appeal as moot.

## **DISMISSED**

### COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

---

**ABS GLOBAL, INC.,**
*Appellant*

**v.**

**CYTONOME/ST, LLC,**
*Appellee*

---

2019-2051

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2017-02097.

---

PROST, *Chief Judge*, dissenting in part.

Time and again the Supreme Court has explained that vacatur is in order when the prevailing party below unilaterally moots an appeal. The Majority today departs from that established practice, concluding that dismissal is the proper course here. It is not. I respectfully dissent from Part III of the Majority's opinion.

I

Cytonome sued ABS in district court for infringing the '161 patent. A few months later, ABS filed a petition for inter partes review of that patent. The Board found some of the patent's claims unpatentable but let others stand.

ABS appealed, asking us to review the Board's decision as to the surviving claims.

Between the Board's decision and this appeal, the district court ruled on summary judgment that ABS did not infringe any claims of the '161 patent. With its response brief in this appeal, Cytonome produced an affidavit by its counsel stating that Cytonome "has elected not to pursue an appeal of the district court's finding of non-infringement as to the '161 patent and hereby disclaims such an appeal." Appellee's Br. Add. 1–2. This disclaimer, Cytonome argued, deprived ABS of "standing." Appellee's Br. 20–22. In its reply brief, ABS explained that "standing" is the wrong framework: "Because ABS undisputedly had standing to pursue the appeal when these proceedings began, Cytonome's argument is properly characterized as an argument about mootness, not standing." Reply Br. 4 (internal quotation marks omitted). ABS then argued that the case was not moot and responded to Cytonome's patentability arguments. When we zeroed in on mootness at oral argument, ABS again maintained that the case was not moot. In the alternative, ABS requested that we vacate instead of dismissing because "the unilateral activity of the appellee is the reason that jurisdiction has disappeared." Oral Arg. at 8:43–9:30.[1] In turn, Cytonome argued that the appeal was moot but nonetheless continued seeking dismissal.

II

The remedy in this case is governed by the Supreme Court's *Munsingwear* line of cases. *See United States v. Munsingwear, Inc.*, 340 U.S. 36 (1950). "From the beginning," the Supreme Court has "disposed of moot cases in the manner most consonant to justice in view of the nature and character of the conditions which have caused the case

---

[1]    No. 19-2051, http://www.cafc.uscourts.gov/oral-argument-recordings ("Oral Arg.").

to become moot." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 24 (1994) (cleaned up). In particular, it has explained that "[v]acatur is in order when mootness occurs through happenstance—circumstances not attributable to the parties—or, relevant here, the 'unilateral action of the party who prevailed in the lower court.'" *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 71–72 (quoting *Bancorp*, 513 U.S. at 23). And that is only fair. "A party who seeks review of the merits of an adverse ruling" but is "frustrated by the vagaries of circumstance" or the "unilateral action" of the appellee "ought not in fairness be forced to acquiesce in the judgment." *Bancorp*, 513 U.S. at 25.

Vacatur avoids this unfairness. It "clears the path for future relitigation" by "eliminating a judgment the loser was stopped from opposing on direct review." *Arizonans*, 520 U.S. at 71. This is "[t]he established practice . . . in the federal system," *id.* (alterations in original) (quoting *Munsingwear*, 340 U.S. at 39), and the Supreme Court's "ordinary practice," *Alvarez v. Smith*, 558 U.S. 87, 97 (2009). And it is "at least equally applicable to unreviewed administrative orders," *A.L. Mechling Barge Lines, Inc. v. United States*, 368 U.S. 324, 329 (1961), including decisions of the Board, *see, e.g.*, *PNC Bank Nat'l Ass'n v. Secure Axcess, LLC*, 138 S. Ct. 1982 (2018); *Apple Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316, 1321 (Fed. Cir. 2020). What is more, the Court has said vacatur is "the *duty* of the appellate court." *Great W. Sugar Co. v. Nelson*, 442 U.S. 92, 93 (1979) (quoting *Duke Power Co. v. Greenwood Cty.*, 299 U.S. 259, 267 (1936)). The Court has discharged that duty in "countless cases." *Id.* We should do likewise here.

## III

This case "falls squarely within the Court's established practice." *See Azar v. Garza*, 138 S. Ct. 1790, 1793 (2018). Cytonome took unilateral action to moot this appeal by disclaiming its district court appeal. Vacatur, therefore, is in order.

It is true that, although the Supreme Court "normally do[es] vacate the lower court judgment in a moot case," this rule is not absolute. *Alvarez*, 558 U.S. at 94. But the exceptions are cases "'[w]here mootness results from settlement' rather than 'happenstance.'" *Id.* (quoting *Bancorp*, 513 U.S. at 25). The Majority does not say this is such a case. Nor could it. In that circumstance, "[t]he judgment is not unreviewable, but simply unreviewed by [a party's] own choice." *Bancorp*, 513 U.S. at 25. ABS had no choice here. It sought a decision on the merits and was thwarted.

The Majority disposes of this case on forfeiture, without considering "the conditions which have caused the case to become moot" as the Supreme Court instructs. *Id.* at 24. But even though ABS requested vacatur for the first time at oral argument, we "may nevertheless, in the exercise of [our] supervisory appellate power, make such disposition of the case as justice requires." *Walling v. James V. Reuter, Inc.*, 321 U.S. 671, 676 (1944). Here it requires vacatur.

The D.C. Circuit's decision in *Columbian Rope Co. v. West* is instructive. 142 F.3d 1313 (D.C. Cir. 1998). There, a challenge to a government-contract award was mooted by forces outside the appellant's control: "The work under the contract at issue ha[d] been completed" by a third party and "all the options to extend the contract ha[d] expired." *Id.* at 1316. Although the appellant had not requested vacatur, that was of no moment. *Id.* at 1318 n.5. The court explained: "While the Supreme Court confirmed in *U.S. Bancorp* that vacatur is an equitable remedy, it did not thereby undo the established precedential backdrop of *Munsingwear*, in which the Supreme Court affirmed that vacatur is 'the duty of the appellate court' when a case has become moot through happenstance while appeal was pending." *Id.* (citations omitted) (quoting *Munsingwear*, 340 U.S. at 40). "Pursuant to that duty," the court concluded, it would order vacatur sua sponte "to preserve the rights of the parties." *Id.* (quoting *Weaver v. United Mine Workers of Am.*, 492 F.2d 580, 587 n. 36 (D.C. Cir. 1973)).

So should we. Like in *Columbian Rope*, forces outside ABS's control mooted this appeal.

The case for vacatur is even stronger here. This appeal was not mooted by mere happenstance but by the unilateral act of an adversary to cement its victories below. The rationale for vacating "is especially pronounced when actions of winning litigants serve to deny their adversaries the opportunity to appeal." *Penguin Books USA Inc. v. Walsh*, 929 F.2d 69, 73 (2d Cir. 1991). "Were it otherwise, appellees could deliberately moot cases on appeal, thereby shielding erroneous decisions from reversal." *Id.* In *Penguin Books*, for example, the appellee mooted the case by publishing the book that was the subject of the appeal. *Id.* at 72. The Second Circuit noted that, in such circumstances, "it may amount to an abuse of discretion not to vacate the lower court order" and vacated the underlying judgment even though "neither party briefed the mootness issue or requested vacatur." *Id.* at 73. These principles hold equally true here. "Basic notions of fairness dictate that successful litigants who render moot an appeal will not receive our assistance in insulating district court decisions from scrutiny," *id.* at 70, and the same goes for decisions of the Board. Further, the courts in *Columbian Rope* and *Penguin Books* granted vacatur sua sponte, without the parties even requesting it. We should grant it here, where ABS did ultimately request vacatur at oral argument.

The Majority relies on two cases, both appeals from preliminary injunctions, in which vacatur first requested at oral argument was denied. Maj. 18. Those cases are a slender reed to lean upon, however, as both indicate that vacatur would be inappropriate regardless in an appeal from a preliminary injunction. One explains that while vacatur "exists to protect a losing litigant from having to live with the precedential and preclusive effects of [an] adverse ruling without having had a chance to appeal it," a preliminary injunction "has no preclusive effect . . . on the judge's

decision whether to issue a permanent injunction." *Radiant Glob. Logistics, Inc. v. Furstenau*, 951 F.3d 393, 397 (6th Cir. 2020) (first alteration in original) (internal quotation marks omitted). Accordingly, "even if" the appellant "hadn't forfeited its right to request vacatur, vacatur still would be inappropriate under the circumstances." *Id.* The other case likewise explains that "[i]n any event, . . . *Munsingwear* orders vacating the underlying order should not typically issue with respect to preliminary injunctions that become moot on appeal." *Orion Sales, Inc. v. Emerson Radio Corp.*, 148 F.3d 840, 843 (7th Cir. 1998).

Mere dismissal here deprives ABS of appellate review through no fault of its own, while vacatur "clears the path for future relitigation" of the appealed determinations. *Munsingwear*, 340 U.S. at 40. And unlike the Majority's cases, this is not an appeal from a preliminary injunction. The Majority says ABS did not "explain why vacatur would be the appropriate remedy" at oral argument, Maj. 17, but ABS explained precisely why vacating in this case serves the rationale underpinning the *Munsingwear* doctrine. Vacating would "protect ABS against the risk of a future suit where [Cytonome] comes in and argues that [ABS has] been estopped." Oral Arg. at 34:39–35:17; *see* 35 U.S.C. § 315(e). That's all ABS needed to say.

Last, the Majority emphasizes that "ABS waited over seven months to raise vacatur" by requesting it at oral argument instead of in its reply brief. Maj. 17. This ignores that Cytonome's theory was a moving target throughout this appeal. Cytonome's response brief argued that ABS lacked "standing," which does not trigger the *Munsingwear* analysis, and ABS's reply brief then demonstrated that standing was the wrong analytical framework. Although the Majority faults ABS for not also requesting vacatur at that time, Cytonome had not yet even argued that the case was moot. Especially given the precedents and rationales discussed above, it does not matter here whether ABS—the

party *opposing* mootness—included the words "and we request vacatur" in its brief.

## IV

It was Cytonome that "mooted ABS's appeal." Maj. 6. That premise underlies the Majority's entire voluntary-cessation analysis. You would not know it, however, from the Majority's remedy. "It would certainly be a strange doctrine that would permit a plaintiff to obtain a favorable judgment, take voluntary action that moots the dispute, and then retain the benefit of the judgment." *Azar*, 138 S. Ct. at 1792. Yet strange as it is, the Majority's opinion permits exactly that. Cytonome obtained a favorable determination from the Board, took voluntary action to moot ABS's appeal, and now will retain the benefit. I respectfully dissent from Part III of the Majority's opinion.