# United States Court of Appeals for the Federal Circuit

---

**AVX CORPORATION,**
*Appellant*

**v.**

**PRESIDIO COMPONENTS, INC.,**
*Appellee*

---

2018-1106

---

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2016-00636.

---

Decided: May 13, 2019

---

GEORGE ELLSWORTH QUILLIN, Foley & Lardner LLP, Washington, DC, argued for appellant. Also represented by RUBEN JOSE RODRIGUES, Boston, MA; MICHAEL ROBERT HOUSTON, RICHARD SPENCER MONTEI, Chicago, IL.

GREGORY F. AHRENS, Wood, Herron & Evans, LLP, Cincinnati, OH, argued for appellee. Also represented by BRETT A. SCHATZ.

---

Before NEWMAN, O'MALLEY, and TARANTO, *Circuit Judges.*

TARANTO, *Circuit Judge*.

Presidio Components, Inc., which manufactures and sells a variety of ceramic capacitors, owns U.S. Patent No. 6,661,639, which describes and claims single-layer ceramic capacitors with certain features. Competitor AVX Corporation manufactures and sells a variety of electronic components, including capacitors. AVX petitioned the Patent and Trademark Office (PTO) for an inter partes review (IPR), under 35 U.S.C. §§ 311−319, of all 21 claims of the '639 patent, asserting several grounds for unpatentability based on obviousness under 35 U.S.C. § 103. The Patent Trial and Appeal Board, acting pursuant to delegated authority, *see* 37 C.F.R. §§ 42.4, 42.108, instituted a review of all claims under 35 U.S.C. § 314. In August 2017, the Board issued a final written decision under 35 U.S.C. § 318. Although it held claims 13–16 and 18 unpatentable, the Board held that AVX had failed to establish unpatentability of all other claims, *i.e.*, claims 1−12, 17, and 19−21 (the "upheld claims").

Presidio does not appeal the Board's decision as to the unpatentable claims, but AVX appeals the Board's decision as to the upheld claims. Presidio responds to AVX on the merits but also argues that AVX, though it has a statutory right to appeal, *see* 35 U.S.C. §§ 141, 319, lacks the standing required by Article III of the Constitution to appeal the Board's decision. Because we conclude that AVX lacks standing, we dismiss the appeal and do not reach the merits of the Board's ruling on the upheld claims.

I

The specification of the '639 patent describes the relevant features of the claimed capacitors. Each capacitor has a dielectric layer sandwiched between two "end blocks," which are made from "composite material" that is either conductive or covered by a conductive coating. '639 patent, col. 3, lines 9–23. In some embodiments described in the specification, and in all claims in dispute on appeal, each

capacitor has a "buried metallization" in the dielectric layer, which is connected to the end blocks by at least one conductive, metal-filled "via." *Id.*, col. 7, lines 46–60. The buried metallization varies the capacitance of the device. *Id.*, col. 7, lines 60–61. The dielectric and composite-material layers are laminated together, cut into chips, and sintered to produce monolithic capacitors that are structurally sound. *Id.*, col. 3, lines 2–9. The capacitors are cheap and easy to produce, and the thin dielectric layers give them high capacitances. *Id.*

Claim 1 is illustrative for present purposes:

1. A capacitor comprising:

an essentially monolithic structure comprising at least one composite portion sintered with a ceramic dielectric portion,

a buried metallization in the dielectric portion and at least one conductive metal-filled via extending from the buried metallization to the composite portion,

wherein the composite portion includes a ceramic and a conductive metal, the capacitor further characterized by a feature selected from the group consisting of:

   (a) the composite portion comprises the conductive metal in an amount sufficient to render the composite portion conductive, wherein the composite portion provides an electrical lead for attaching the capacitor to a metallic surface trace on a printed circuit board; and

   (b) a metallization area partially between the composite portion and the ceramic dielectric portion, and a conductive metal coating on faces of the composite portion not sintered to the ceramic dielectric portion, whereby the

> conductive metal coating provides an electri-
> cal lead for attaching the capacitor to a me-
> tallic surface trace on a printed circuit board.

*Id.,* col. 11, lines 14–35.

When AVX filed its opening brief in this court, it also submitted a declaration by its general counsel, Evan Slavitt, to try to establish its constitutional standing to bring this appeal to contest the Board's rejection of its patentability challenges to the upheld claims. Mr. Slavitt first characterized AVX's business strategy. He noted that AVX spent approximately $31 million on research, development, and engineering in fiscal year 2017. J.A. 2049 ¶ 6. He also stated that "AVX protects its advances by properly applying for patents where appropriate and holds dozens of U.S. patents relating to capacitors." J.A. 2049 ¶ 7.

Mr. Slavitt further explained how AVX and Presidio interact in the capacitor market. He noted that, since 2008, there have been four district court actions between AVX and Presidio involving potential infringement of various capacitor patents (belonging to one side or the other). J.A. 2049–53.[1] In one of those cases, AVX was required to pay roughly $3.3 million in damages and was enjoined from selling a capacitor found to infringe a Presidio patent not involved in this appeal. J.A. 2050 ¶ 13. In AVX's view, the true costs of litigation are even higher because "it costs AVX substantial goodwill in presenting its customers with alternative products." J.A. 2053 ¶ 24. Because it can be

---

[1]     The suits involved either AVX's wholly owned subsidiary American Technical Ceramics Corp. or both AVX and the subsidiary. AVX's own declarant has not distinguished the two corporations for standing purposes. We determine that AVX lacks standing even if the two corporations are treated as one. We therefore refer simply to AVX.

difficult to substitute one component for another, Mr. Slavitt stated that "even the threat of a permanent injunction can dissuade customers from choosing a particular capacitor." J.A. 2054 ¶ 27. He noted that he knew of at least one customer who would not buy one of AVX's capacitors because of the risk of a future injunction. *Id.* ¶ 28.

With respect to the '639 patent, Mr. Slavitt expressed his belief that "[t]he threat of future litigation between Presidio and AVX . . . is substantial" given the parties' litigation history. *Id.* ¶ 29. He noted that AVX would be "materially hindered" if the Board decision stood and were given estoppel effect under 35 U.S.C. § 315(e), which would preclude AVX from repeating, in future litigation, the obviousness challenges to the '639 patent that the Board reviewed and rejected in this IPR. *Id.* ¶ 30. Mr. Slavitt suspected that Presidio would be "especially encouraged to assert the '639 patent" to gain leverage in negotiations to settle another pending lawsuit. J.A. 2055 ¶ 32. He asserted that even the "substantial threat of litigation" over the '639 patent "will dissuade some customers or potential customers from choosing AVX capacitors." *Id.* ¶ 33.

II

Because the Constitution limits its grant of the "judicial power" to "Cases" or "Controversies," U.S. Const., art. III, § 2, any party that appeals to this court must have standing under Article III before we can consider the merits of the case. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997) ("The standing Article III requires must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance."). For a party to have standing, it must show (1) an "injury in fact," (2) "a causal connection between the injury and the conduct complained of," and (3) a likelihood that "the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (internal quotation marks

omitted). An injury in fact is "a legally protected interest which is (a) concrete and particularized" and "(b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotation marks omitted). An injury is concrete if it is "real" rather than "abstract," though it need not be "tangible." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548–49 (2016). An injury is particularized if it "affect[s] the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1.

A person does not need to have Article III standing to file an IPR petition and obtain a Board decision, because Article III requirements do not apply to administrative agencies. *See Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2143–44 (2016). An IPR petitioner that lost on some or all of its challenges before the Board therefore might lack Article III standing to appeal. Recognizing that possibility, and noting that "the party seeking judicial review . . . has the burden of establishing" standing, we have therefore held that "in IPR appeals, 'an appellant must . . . supply the requisite proof of an injury in fact when it seeks review of an agency's final action in a federal court,' by creating a necessary record in this court, if the record before the Board does not establish standing." *JTEKT Corp. v. GKN Automotive Ltd.*, 898 F.3d 1217, 1220 (Fed. Cir. 2018) (quoting *Phigenix, Inc. v. Immunogen, Inc.*, 845 F.3d 1168, 1171−72 (Fed. Cir. 2017)). We have added that, "when the record before the Board is inadequate," the appellant "'must supplement the record to the extent necessary to explain and substantiate its entitlement to judicial review,' such as by submitting 'affidavits or other evidence to demonstrate its standing.'" *Id.* (quoting *Phigenix*, 845 F.3d at 1173).

AVX does not contend that a statutory right to appeal itself establishes AVX's constitutional standing. *See* 35 U.S.C. §§ 141, 319. We have rejected such a contention, *Phigenix*, 845 F.3d at 1175, relying on the Supreme Court's explanation that "Congress cannot erase Article III's

standing requirements by statutorily granting the right to sue to [an appellant] who could not otherwise have standing," *Raines v. Byrd*, 521 U.S. 811, 820 n.3 (1997). *See also Frank v. Gaos*, 139 S. Ct. 1041, 1046 (2019) ("Our decision in *Spokeo* abrogated [a court of appeals ruling] that the violation of a statutory right automatically satisfies the injury-in-fact requirement whenever a statute authorizes a person to sue to vindicate that right.").

AVX makes two arguments in support of its Article III standing to appeal. We reject both.

A

AVX argues first that it is injured by the Board's rejection of its obviousness challenges to the upheld claims because, it says, the statutory estoppel provision, 35 U.S.C. § 315(e), would prevent it from asserting the same challenges—the merits of which will not have been reviewed by an Article III court if we find no standing—if Presidio asserts those claims against AVX in the future.

The first paragraph of the estoppel provision declares that once the Board issues its final written decision in an IPR, the IPR petitioner may not initiate another PTO proceeding to challenge the same patent claim on any ground that the petitioner "raised or reasonably could have raised" in the Board-decided IPR. 35 U.S.C. § 315(e)(1). The second paragraph concerns later non-PTO proceedings:

> The petitioner in an inter partes review of a claim in a patent under this chapter that results in a final written decision under section 318(a) . . . may not assert either in a civil action arising in whole or in part under section 1338 of title 28 or in a proceeding before the International Trade Commission under section 337 of the Tariff Act of 1930 that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that inter partes review.

*Id.* § 315(e)(2). In AVX's view, this language means, for example, that AVX is now forever barred from asserting in district court, either in a declaratory judgment action or as a defense or counterclaim in an infringement action, that the upheld claims are invalid for obviousness on the same grounds on which the present IPR was instituted.

We reject AVX's argument for standing on this basis. *First*, we have already rejected invocation of the estoppel provision as a sufficient basis for standing. In *Phigenix*, we held that § 315(e) "'do[es] not constitute an injury in fact' when, as here, the appellant 'is not engaged in any activity that would give rise to a possible infringement suit.'" 845 F.3d at 1175–76 (quoting *Consumer Watchdog v. Wis. Alumni Research Found.*, 753 F.3d 1258, 1262 (Fed. Cir. 2014) (discussing similar provision of the inter partes reexamination statute that preceded the IPR regime)). We followed that ruling in *JTEKT*. *See* 898 F.3d at 1221. We do so again here.

*Second*, this court has not decided whether the estoppel provision would have the effect that AVX posits—specifically, whether § 315(e) would have estoppel effect even where the IPR petitioner lacked Article III standing to appeal the Board's decision to this court. For this court to so hold, we would have to consider whether that reading of § 315(e) is tied to § 319's right of appeal for any "party dissatisfied with the final written decision" of the Board. Relatedly, we would also have to consider whether § 315(e) should be read to incorporate a traditional preclusion principle—that neither claim nor issue preclusion applies when appellate review of the decision with a potentially preclusive effect is unavailable. *See Penda Corp. v. United States*, 44 F.3d 967, 973 (Fed. Cir. 1994) ("It is axiomatic that a judgment is without preclusive effect against a party which lacks a right to appeal that judgment."); *see Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 647 (2006); *SkyHawke Techs., LLC v. Deca Int'l Corp.*, 828 F.3d 1373, 1376 (Fed.

Cir. 2016).  We have not addressed those and other considerations bearing on the proper application of § 315(e).

We decline to do so here.  The parties have not briefed the issue; indeed, we have no adversarial presentations on the issue, because AVX assumes estoppel as a predicate for its standing argument and Presidio has evidently decided not to give up a possible future estoppel argument.  If, in the future, a live controversy over the upheld claims arises between Presidio and AVX, and if either an infringement action or declaratory judgment action involving those claims is filed in district court, AVX can, in such an action, test whether § 315(e) bars it from raising the obviousness challenges that the Board reviewed and rejected.  At that point, the parties presumably would be adverse on the issue.

Accordingly, we turn to AVX's second argument for standing, which focuses on whether AVX currently has a nonspeculative stake in cancelling the upheld claims.

## B

AVX argues that the Board's decision upholding claims 1–12, 17, and 19–21 of the '639 patent injures AVX because the decision reduces AVX's ability to compete with Presidio.  AVX relies on decisions that, in nonpatent contexts, have found "competitor standing" to challenge certain government actions.  But the rationale for finding standing in those cases does not carry over to support standing in the present context, where AVX has no present or nonspeculative interest in engaging in conduct even arguably covered by the patent claims at issue.

We addressed the doctrine of "competitor standing" in *Canadian Lumber Trade Alliance v. United States*, 517 F.3d 1319, 1324 (Fed. Cir. 2008).  In that case, we examined the interplay between the North American Free Trade Agreement and the Continued Dumping and Subsidy Offset Act, which distributes antidumping and countervailing

duties to harmed domestic producers. One appellant, the Canadian Wheat Board, had constituent members who allegedly competed with U.S. producers receiving the distributions, *id.* at 1332, including the North Dakota Wheat Commission, which promoted the sale of wheat from North Dakota farmers to "take back market share from Canadian Wheat," *id.* at 1334. We held that the Canadian Wheat Board had shown that it was likely to be injured by the distribution of duties to this U.S. competitor. *Id.*

"Competitor standing" also appears in other cases involving regulatory law. *See id.* at 1332 (collecting cases). In *Canadian Lumber*, we highlighted the Supreme Court's decisions in *Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (farmers' cooperative actively negotiating and seeking to buy processing plant had standing to challenge government cancellation of tax benefit affecting purchase), and *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 152 (1970) (sellers of data processing services had standing to challenge government action allowing major new sellers into market). In those cases, the Court recognized that government actions that "alter competitive conditions" *may* give rise to injuries that suffice for standing. *Clinton*, 524 U.S. at 433 (quoting 3 Kenneth Culp Davis & Richard J. Pierce, Administrative Law Treatise 13–14 (3d ed. 1994)); *see id.* at 432–33 (citing *Inv. Co. Inst. v. Camp*, 401 U.S. 617 (1971) (financial companies had standing to challenge Comptroller of the Currency's approval of competing bank's application to run a collective investment fund)). The D.C. Circuit has articulated a similar theory of "competitor standing." *See, e.g.*, *U.S. Telecom Ass'n v. FCC*, 295 F.3d 1326, 1331 (D.C. Cir. 2002) (association had standing to challenge FCC's order designating a communications network as a common carrier, making federal subsidies available to the network); *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) (electric company had standing to challenge FERC's approval of competitor company's application to

sell electricity at market-based rates).  As the D.C. Circuit has made clear, however, not every alleged possible competitive harm suffices: standing has been found where the plaintiff/appellant challenges a government action that "provides benefits to an existing competitor or expands the number of entrants in the petitioner's market, not an agency action that is, at most, the first step in the direction of future competition." *New World Radio, Inc. v. FCC*, 294 F.3d 164, 172 (D.C. Cir. 2002) (radio-station licensee did not have standing to challenge FCC's renewal of another firm's license for a station that did not itself compete with the challenger, where only possible future competition was shown).

In all the cases to which we have been pointed in which standing rested on competitive harm, the challenged government action nonspeculatively threatened economic injury to the challenger by the ordinary operation of economic forces.  For example, competitive injury to a challenger is highly likely where the government action has a natural price-lowering or sales-limiting effect on the challenger's sales (compared to what prices or sales would be in the absence of the government action), either by directly lowering competitors' prices for competing goods or by opening the market to more competitors.  In such circumstances, findings of standing in *Canadian Lumber* and the other "competitor standing" cases are applications of the standing requirement that the disputed action must pose a nonspeculative threat to a concrete interest of the challenger.  *See* 517 F.3d at 1332–34; *see also Spokeo*, 136 S. Ct. at 1548 ("A 'concrete' injury must be 'de facto'; that is, it must actually exist.  When we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term—'real,' and not 'abstract.'" (citation omitted)).

The government action at issue here is quite different.  The government action is the upholding of specific patent claims, which do not address prices or introduce new competitors, but rather give exclusivity rights over precisely defined product features.  That sort of feature-specific

exclusivity right does not, by the operation of ordinary economic forces, naturally harm a firm just because it is a competitor in the same market as the beneficiary of the government action (the patentee).

A patent claim *could* have a harmful competitive effect on a would-be challenger if the challenger was currently using the claimed features or nonspeculatively planning to do so in competition, *i.e.*, if the claim would block the challenger's own current or nonspeculative actions in the rivalry for sales. We have so recognized. *See E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1005 (Fed. Cir. 2018); *Altaire Pharm., Inc. v. Paragon Bioteck, Inc.*, 889 F.3d 1274, 1281–84 (Fed. Cir.), *remand order modified by stipulation*, 738 F. App'x 1017 (Fed. Cir. 2018) (mem.). At the same time, we have repeatedly insisted that such interest in using the claimed features be nonspeculative, denying standing to IPR petitioners that appeal claim-upholding Board decisions where those petitioners lacked "concrete plans for future activity that creates a substantial risk of future infringement or likely cause the patentee to assert a claim of infringement." *JTEKT*, 898 F.3d at 1221; *see Momenta Pharm., Inc. v. Bristol-Myers Squibb Co.*, 915 F.3d 764 (Fed. Cir. 2019); *Phigenix*, 845 F.3d at 1173–75.

Taking all of AVX's allegations as true, we conclude that AVX has not shown that it is engaging in, or has nonspeculative plans to engage in, conduct even arguably covered by the upheld claims of the '639 patent. AVX does not assert, for example, that it is developing a new capacitor that Presidio would likely argue falls within the scope of the upheld claims. Nor does AVX contend that it has set aside resources to develop such a product but cannot move forward because the upheld claims stand in the way. The broad allegations in Mr. Slavitt's declaration are insufficient. It does not matter that Presidio has sued AVX over capacitors that did not contain the buried metallizations claimed in the '639 patent. *See* J.A. 2049–53. The general

observation that litigation can reduce customers' goodwill says nothing about the concrete interest required for standing to litigate particular claims in this Article III court. *See* J.A. 2053 ¶ 24. And AVX's suspicion that Presidio would assert the upheld claims against AVX if it had a reasonable basis for doing so, *see* J.A. 2055 ¶ 32, does not mean that there is any reasonable basis right now.

*JTEKT* confirms the deficiencies of AVX's allegations. In *JTEKT*, the appellant alleged that it was working on a product that might infringe the relevant patent, but it conceded that "no product [was] yet finalized" and that the product would "continue to evolve." 898 F.3d at 1221. Despite the nonzero risk of future litigation, we dismissed the appeal for lack of standing because JTEKT "ha[d] not established at th[at] stage of the development that its product create[d] a concrete and substantial risk of infringement or [would] likely lead to claims of infringement." *Id.* In this case, AVX has not pointed to a capacitor in *any* stage of development that might implicate the upheld claims of the '639 patent. AVX lacks the current or nonspeculative interest in practicing those claims without which we have repeatedly denied standing in similar circumstances.

Although *JTEKT* seems the most directly on point of our cases, other cases support the same conclusion. In *Phigenix*, the appellant was "a for-profit discovery stage biotechnology, pharmaceutical, and biomedical research company" that worked on cancer treatments. 845 F.3d at 1170. Although it did not manufacture any products, Phigenix maintained a significant portfolio of intellectual property. *Id.* It claimed that it "suffered an actual economic injury because the [relevant] patent increase[d] competition" between Phigenix and the patent holder and because the patent hindered Phigenix's licensing opportunities. *Id.* at 1174. We dismissed the appeal for lack of standing because "Phigenix d[id] not contend that it face[d] risk of infringing the [relevant] patent, that it [was] an

actual or prospective licensee of the patent, or that it otherwise plan[ned] to take any action that would implicate the patent." *Id.* at 1173–74. Our reasoning in *Phigenix* applies here with equal force, even though AVX, unlike Phigenix, manufactures and sells its own products. Like Phigenix, AVX has not presented allegations that it faces any risk of infringing the upheld claims of the '639 patent, that it is a prospective licensee of the upheld claims, or that it otherwise plans to take action that would implicate those claims.

Our recent decision in *Momenta* is also instructive. In that case, Momenta was developing a biosimilar for a drug made by Bristol-Myers Squibb (BMS), another pharmaceutical company. 915 F.3d at 766. During the litigation, Momenta's biosimilar failed Phase I clinical trials, and Momenta issued a press release noting that it intended "to exit its participation in the development of . . . five biosimilar programs," including the program related to BMS's product. *Id.* We rejected Momenta's attempt to establish standing because Momenta "made clear that no concrete plans [were] afoot." *Id.* at 770. The same is true here. Mr. Slavitt's declaration identifies no concrete plans for AVX to develop a capacitor that might implicate the upheld claims of the '639 patent.

Cases where we determined that petitioners did have standing to pursue their appeals illustrate what is missing from this case. In *Altaire*, we held that the appellant had standing because its injury was "inevitable." 889 F.3d at 1283. Although an agreement with Paragon prevented Altaire from infringing at the time of appeal, three other things were true: (1) Paragon had already filed a declaratory judgment action seeking to terminate that agreement; (2) after the agreement was terminated or otherwise expired three years later, Altaire intended to file an Abbreviated New Drug Application that would amount to an act of infringement; and (3) Paragon refused to stipulate that it would not sue Altaire for infringement. *Id.* at 1282–83; *see*

35 U.S.C. § 271(e)(2)(A). Those facts strongly suggested the inevitability of an infringement suit, but that inevitability is missing here. At this point, it is just speculation whether AVX will want to develop or sell a new capacitor that even arguably falls within the upheld claims of the '639 patent and so prompt Presidio to file suit.

This case is also quite different from the recent *DuPont* case. There, we held that DuPont had standing to appeal the Board's decision even though Synvina had never filed an infringement action against it. 904 F.3d at 1004–05. But in that case, DuPont had designed and already begun operating a plant according to technical specifications that arguably made its conduct infringing. *Id.* at 1004. The process at that plant used "the same reactants to generate the same products using the same solvent and same catalysts" as the relevant patent, making an infringement suit against DuPont a real possibility. *Id.* at 1005. As we have now reiterated several times, AVX is not similarly undertaking or planning activity that gives it a concrete stake in obtaining an adjudication of unpatentability of the upheld claims of the '639 patent.

Because, for those reasons, AVX has not sufficiently alleged current or nonspeculative activities of its own that arguably fall within the scope of the upheld claims, we conclude that AVX has identified no harm to it, competitive or otherwise, resulting from the Board's decision. Notably, AVX offers no argument for how, given our conclusion about AVX's own activities, the Board's decision is likely to strengthen Presidio's ability to compete so as to cause harm to AVX. As a legal matter, Presidio requires no patent to make or sell what is covered by the upheld claims: a patent is only a right to exclude, not a right to practice. *Bauer & Cie v. O'Donnell*, 229 U.S. 1, 10 (1913). And there is simply no evidence in this case that, as an economic matter, Presidio's ability to compete against AVX is enhanced by the upheld claims in a way that would harm AVX if AVX lacks a nonspeculative interest in itself engaging in conduct even

arguably within the upheld claims.  Presidio's exclusivity right might exclude *other* capacitor makers from making products covered by the upheld claims, but such a reduction in the number of AVX's competitors on its face tends to help AVX (by reducing competition), not harm it.  *Cf. Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 336–37 (1990) (rejecting respondent's theory of "antitrust injury" because petitioner's pricing scheme "would have worked to [respondent]'s advantage").  There is no evidence that losing the patent protection of the upheld claims would lead Presidio to invest less in making and selling its claim-covered product.  Thus, whatever scenarios of competitive harm are conceivable in other cases, there is no showing here that cancelling the upheld claims would in any way benefit AVX as a competitor or otherwise.

We have considered AVX's other arguments but find them unpersuasive.  Because AVX's estoppel and "competitor standing" theories both fail, we must dismiss this appeal for lack of jurisdiction in this court.  *See Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.").

## III

Concluding that AVX lacks Article III standing to appeal the Board's final written decision, we dismiss the appeal.

**DISMISSED**